Adam B. Wolf (Cal Bar No. 215914)
Tracey B. Cowan (Cal Bar No. 250053)
PEIFFER WOLF CARR KANE & CONWAY,
A Professional Law Corporation
5042 Wilshire Blvd., No. 304
Los Angeles, CA  90036
Telephone: 415.766.3545
Facsimile: 415.402.0058
Email: awolf@peifferwolf.com
       tcowan@peifferwolf.com

[Additional counsel listed in signature block]

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERI LATRONICO, CAREY CARATINI, & BROOKE WOLF, individually and on behalf of their minor children and all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>MEDACCESS NETWORK HEALTH CARE PLAN; THE MEDICAL ACCESS NETWORK, LLC; RISEMED HEALTH; DEMARIS SERRANO; JENNIFER ACOSTA; & EMMA MANZANO.<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Plaintiffs Sheri Latronico, Carey Caratini, and Brooke Wolf (together, "Plaintiffs"), by and through their undersigned counsel, hereby bring this Class Action Complaint ("Complaint") on behalf of themselves, their minor children, and all others similarly situated.

**INTRODUCTION**

1. This action arises from illegal activity by Medical Access Network, LLC, its alter egos, controlling officers and co-conspirators that occurred in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68.

2. Defendants marketed and continue to market a series of purported "employee-benefits plans" in a scheme to defraud plan participants out of the premiums paid under such plans. Plaintiffs bring this action on behalf of one such plan, the "MedAccess Plan."

3. Defendants made numerous misrepresentations to Plaintiffs regarding the viability of the plan, including but not limited to representations that these plans were administered in accordance with the provisions governing ERISA.

4. In actuality, Defendants failed to establish claims procedures or benefits review procedures, in violation of their ERISA fiduciary duties to the MedAccess Plan and its participants. Defendants knew that the MedAccess Plans were not ERISA-compliant, and moreover, knew that the MedAccess Plans were too undercapitalized to pay medical benefit claims on an ongoing basis.

5. Despite this knowledge, Defendants repeatedly misrepresented the characteristics of these plans to Plaintiffs and others, using mail and wire in interstate commerce to solicit premiums and mislead plan participants about the true nature of the scheme, in violation of RICO.

6. Defendants further sought to evade their fiduciary obligations and the consequences of their scheme by repeatedly rebranding themselves as offshoots of the Medical Access Network, LLC.

7. As a result of this scheme, MedAccess Plan participants who justifiably believed in the legitimacy of the plan, including Plaintiffs, paid for health insurance they did not actually receive. These Plan participants lost dutifully paid premiums, and are now facing large unpaid

medical bills that should have been paid, in whole or in part, by the MedAccess Plan and are causing significant damages to Plaintiffs' credit, finances, and well-being.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question).

9. Venue is proper within this judicial district because it is where the breach occurred, specifically, where the Medical Access Network Health Care Plan was administered, and where one or more Defendants reside and may be found.

10. Furthermore, pursuant to 18 U.S.C. § 1965, venue is proper because one or more Defendants either reside, have an agent or transact affairs in this Eastern District of California.

## PARTIES

11. Plaintiff Sheri Latronico ("Latronico") is a former MedAccess Plan participant. At all times mentioned herein Latronico was a citizen of the State of Illinois and currently resides in that State.

12. Plaintiff Carey Caratini ("Caratini") is a former MedAccess Plan participant. At all times mentioned herein Caratini was a citizen of the State of Florida and currently resides in that State.

13. Plaintiff Brooke Wolf ("Wolf") is a former MedAccess Plan participant. At all times mentioned herein Wolf was a citizen of the State of Ohio and currently resides in that State.

14. Defendant MedAccess Network Health Care Plan (the "Plan" or "MedAccessPlan") is an ERISA-based benefit health plan available in all 50 states administered by the Medical Access Network, LLC.

15. Defendant Medical Access Network, LLC ("MedAccess") is a limited liability company with its principal place of business in Fresno, California. According to corporate filings filed with the State of California, all MedAccess members/mangers are citizens of California.

16. Defendant RiseMed Health is an alter ego of MedAccess, doing business in the State of California.

17. Damaris "Demi" Serrano ("Serrano") is the CEO and Founder of MedAccess. Upon information and belief, she is a citizen of California and currently resides in that State.

18. Jennifer Acosta, aka Jennifer Vallez-Acosta ("Acosta"), is MedAccess's Controller. Upon information and belief, she is a citizen of California and currently resides in that State.

19. Emma Manzano is a representative of MedAccess. Upon information and belief, she is a citizen of California and currently resides in that State.

## FACTUAL ALLEGATIONS

*I.  Background: Administration of the MedAccess Plan*

20. The MedAccess Network Health Care Plan was marketed as an ERISA-based benefit health plan available in all 50 states. According to Plan documents, benefits were paid out of ERISA-regulated and bonded trust funds.

21. The Plan was marketed as particularly well-suited for young women and expectant mothers, offering low premiums and pediatric coverage beginning at birth.

22. Plaintiffs and other Plan participants enrolled in the Plan by completing a MedAccess Enrollment Packet that included: "Health Care Member Benefits Enrollment Form," "Terms and Conditions," and "HIPAA Authorization for the Release of Medical Information." The Enrollment Packet was transmitted to Plan participants, including Plaintiffs, through the mail and also by wire.

23. According the "Terms and Conditions" set forth in the MedAccess Enrollment Packet, coverage began the first of the month after the contract was signed. The address listed on the MedAccess Enrollment Packet was: 4275 Executive Square Suite 200, La Jolla CA 92037.

24. These same Plan documents also indicated that the Plan covered pediatric visits for children born of maternal Plan participants. Accordingly, these children were also participants of the Plan.

25. After the MedAccess Enrollment Packet was submitted, participants were then furnished with "Confirmation of Coverage" that "serv[ed] as written confirmation of coverage . . . under MEDACCESS NETWORK Heath plans." This form set forth medical coverages purchased by the Plan participant.

26. The "Confirmation of Coverage" also stated that Plan participants' claims were to be submitted "to [MedAccess's] billing department," listing the address as:

      Medical Access Network

      530 E Herndon, Suite 105

      Fresno CA 93720

Notwithstanding the above, in various wire transmissions agents of MedAccess described a process whereby larger claims were sent to a "bill review company" for further review.

27. MedAccess did not provide participants with any additional notice regarding the Plan's claims procedure or administration.

28. Although premiums were dutifully paid by participants, in mid-2019, participants, including Plaintiffs, began reporting claims-payment issues to MedAccess representatives.

29. In addition to these claims-payment issues, participants also reported issues with coverage verification and MedAccess' failure to provide necessary documentation to providers and others.

30. MedAccess representatives assured Plan participants, including Plaintiffs, that their claims would be paid. In practice, however, the claims were never paid; in many cases they were never even adjusted. Instead, MedAccess representatives offered continual platitudes that claims were in process or would be paid soon. These statements, which were made over wire, were false.

31. By October of 2019, Plan participants, including Plaintiffs, were no longer able to reach MedAccess through traditional channels as it had closed its corporate office. Phone calls were no longer answered.

32. Plan providers were likewise unable to reach MedAccess to discuss adjustment or payment of claims.

33. By approximately January 2020, all meaningful communication between representatives of MedAccess and participants had ceased, and MedAccess uniformly failed to respond to all claims for benefits.

34. To date, Plan participants' claims, including Plaintiffs' claims, have never been paid. These claims were never formally "denied"—they simply remain pending, ostensibly awaiting adjustment activity or payment by MedAccess.

35. Throughout their participation in the MedAccess Plan, Plaintiffs and other participants suffered harms because they had no meaningful access to a mechanism by which they could obtain benefits determinations related to their claims. Plaintiffs paid premiums to participate in a plan that did not adjust, let alone pay, their claims.

II.   *MedAccess's Shifting Identity*

36. The harms suffered by Plaintiffs were compounded by the shifting identity of MedAccess, as well as by the misrepresentations made by MedAccess's corporate controllers that call into question the legitimacy of MedAccess, its Plan(s), and any plans offered by its alter egos.

37. Corporate filings identify MedAccess's business address as: (1) 4572 Executive Square Ste 200, La Jolla CA 92037, and (2) 530 E Herndon Ave Ste 105, Fresno CA 93720.

38. As of the date of this complaint, MedAccess's website is inaccessible and all phone numbers associated with MedAccess have been disconnected. However, a paper and wire trail exists documenting the various prior and subsequent iterations of MedAccess and its "Plans."

39. Although the MedAccess Plan was marketed to participants as new, Plaintiffs and others who enrolled in this plan were not advised that plans offering coverage from January 1, 2019 - December 31, 2019, had been previously marketed as Inzuria Health Plans, including but not limited to its "Telemeda 89" and "Telemeda 59" plans.

40. Summary Material from Inzuria Health evidences its connection to MedAccess. These materials indicated information regarding prescription drug coverage could be obtained at www.themedicalaccessnetwork.com and that grievances could be filed with:

> ATTN: Grievances and Appeals
>
> MEDA ACCESS NETWORK
>
> 4572 Executive Square, Suite 200
>
> La Jolla, CA 92037

This was the same mailing address listed on the MedAccess Enrollment Packet.

41. Like MedAccess, Inzuria Health plans were offered "in all 50 states," and the entity appears largely defunct, with no one to answer for the unpaid medical expenses of individuals who participated in these plans.

42. A new entity, RiseMed Health ("RiseMed"), is currently offering the same plans that were previously sold by Inzuria Health and then MedAccess.

43. Like Med Access, RiseMed and RiseMed Health offer plans previously offered by Inzuira Health, including "MEC BASIC" "MEC Plus," "MEC Premium" "MEC Super," "Telemeda 59," and "Telemeda 89."

44. In fact, RiseMed has made repeated representations to healthcare providers, and on various websites that it is now doing business as "MedAccess Network."

45. RiseMed uses the same marketing language MedAccess used, and its website features a section entitled "Member Perks," that links directly to "medaccess.memberperks.us."

46. Inzuria Health, MedAcess, and RiseMed all use the service mark "Med Access Network."

47. RiseMed Health's office is located as 530 E Herndon Ave, Suite 105, Fresno, CA—the same address previously used by MedAccess.

48. RiseMed identifies its "partners" as: 1) ReliaShield, 2) Cigna, 3) First Health Network, 4) remedy.me, 5) SIMNSA, and 6) IPM ChoiceRX Formulary. Identical "partners" were listed on MedAccess's Enrollment Form.

49. The existence of RiseMed was never conveyed to Plaintiffs or other MedAcess Plan participants.

50. Based on the above, it is alleged that MedAccess, Inzuria Health, and RiseMed are alter egos of each other, offering the same purported health care plan "coverage," under different names.

51. Some of all of the foregoing entities are also associated with Defendant Damaris "Demi" Serrano, who has held herself out as the "CEO and Founder," or "President," of MedAccess.

52. Serrano also controls SolSource Spendthrift Trust ("SolSource"), located at 760 N Euclid Ste 207, Anaheim, CA 92801.

53. MedAccess's corporate filings with the California Secretary of State identify SolSource as a member/manager of MedAccess, along with Henry Mendiola, Michael Jarquin, Scott Gengler, Henry Hernandez, and Esteban Zwirn.

54. Another Serrano-controlled entity, "Beyond Staffing Solutions, Inc.," has also held itself out as a "Partner" of MedAccess.

55. Michael Jarquin, one of MedAccess's manager/members, has been associated with at least three other entities that have listed 530 E. Herndon Ave Ste 105, Fresno CA 93720 – *i.e.*, one of MedAccess's business address—as their business address on corporate filings, including Quinox, Inc., AllStaff, Inc., and Preferred Services Group, LLC.  Notably, at least one of these entities also offers ERISA-based employee benefits plans of the sort that MedAccess claims to offer.

56. Plan documents provided by MedAccess did not affirmatively identify a singular plan administrator.  One document participants received indicated the plan was administered by an "Association Benefit Plan Administrator and its affiliates," and another specified participants are "joining THE MEDICAL ACCESS NETWORK ASSOCIATON."

57. This "Association" is in reality a loose-knit association of affiliated businesses controlled by the foregoing common owners that exists for the purpose of using wire and mail to collect premium payments from the sale undercapitalized health insurance plans that they know are unable to pay, or even adjust, claims submitted by Plan participants.

III. *Plaintiff Latronico's Experience*

58. Sheri Latronico was enrolled in the plan for approximately seven months. On March 26, 2019, she completed a "Health Care Member Benefits Enrollment Form" packet. On April 2, 2019, Latronico received a certificate from MedAccess "serv[ing] as written confirmation of coverage . . . under MEDACCESS NETWORK Heath plans provided through First Health National PPO Network."

59. Latronico's participation in the plan was also evidence by the monthly $448 premiums payment paid directly to MedAccess via debit/credit card.

60. Latronico's primary motivation for obtaining coverage was to secure health insurance for herself and her unborn child. According to documentation Latronico received, the Plan offered "Full access Wellness and Preventative Care," including "Maternity Pre/Post Natal." On October 12, 2019, Latronico gave birth to a baby boy, who thereafter became a plan participant.

61. Shortly after Latronico's coverage began on April 1, 2019, Latronico began having claims issues with the Plan. Latronico, her providers, and the broker who sold the policy to Latronico all attempted to contact MedAccess to confirm Latronico's coverage. Latronico herself reached out to MedAccess numerous times due to claims and coverage issues she was having, and each time MedAccess reassured her that her claims would eventually be adjusted and paid.

62. Latronico continued to experience these same issues after her son was born.

63. Throughout Latronico's participation in the Plan, MedAccess repeatedly suggested these issues, including the failure to initiate claims adjustment, were not its fault. For example, when Latronico relayed her issues to MedAccess representatives, they blamed Latronico's medical providers. When Latronico relayed that she had never received an insurance card, MedAccess suggested that Latronico had probably thrown the card out, noting that other participants had seemingly thrown theirs out "because they are not thick plastic." Upon information and belief none of the participants, including Latronico, ever received an insurance card.

64. Latronico also contacted Defendants Serrano and Acosta on numerous occasions. Serrano responded to these communications via email by identifying herself as the CEO and Founder of MedAccess and misrepresenting that she was in the process of "paying" claims.

65. While enrolled in MedAccess Latronico also communicated directly with Manzano. In her initial correspondence with Latronico, Manzano characterized herself as the "membership manager," indicating she "receive[s] claims and put[s] them in [the MedAccess] system and send[s] them to bill review but [does] not pay them." However, in later correspondence she stated that her role was to actually adjust claims. For example, in one correspondence she referenced "changes made within the plan before [Latronico] signed up," and referenced problems other participants had with claim processing.

66. On December 16, 2019, Latronico canceled her Plan membership. In the months following, she made repeated attempts to communicate with MedAccess to obtain clarity on the claims review process and get her bills paid. She spoke to several MedAccess representatives who at first continued to assure her that her claims would be paid soon. However, by January 2020 all meaningful dialogue between Latronico and MedAccess had effectively ceased.

67. As of the date of this complaint over $13,000 of Latronico's medical bills remain unpaid. Latronico is severely distressed as she is unable to pay her bills.

IV.   *Plaintiff Caratini's Experience*

68. Carey Caratini was enrolled in the plan for approximately eight months. On April 18, 2019, she completed a "Health Care Member Benefits Enrollment Form" packet. She later received a certificate from MedAccess "serv[ing] as written confirmation of coverage . . . under MEDACCESS NETWORK Heath plans provided through First Health National PPO Network."

69. Caratini's participation in the plan was also evidence by the monthly $734 premiums payment paid directly to MedAccess via debit/credit card.

70. Caratini's primary motivation for obtaining coverage was to secure health insurance for herself and her unborn child. According to documentation Caratini received, the Plan offered "Full access Wellness and Preventative Care," including "Maternity Pre/Post Natal." On November 18, 2019, Caratini gave birth to a baby boy, who thereafter became a plan participant.

71. Shortly after her child's birth, Caratini was advised by her medical provider that none of her prenatal claims had been paid by MedAccess.

72. Caratini's medical provider told her that they had contacted MedAccess numerous times, and that each time had been told by a MedAccess representative that Caratini's claims were still being processed and that her claims would be taken care of by the "end of the week."

73. After learning of the above, Caratini contacted MedAccess directly via telephone and was also advised that her claims would be paid by the end of November 2019.

74. The claims were never adjusted, let alone paid.

75. On December 31, 2019, Caratini canceled her Plan membership. Receipt of her cancellation was acknowledged by Manzano.

76. In the months following, Caratini made repeated attempts to communicate with MedAccess and Manzano to obtain clarity on the claims review process and get her bills paid. After sending MedAccess a bill on February 12, 2020, Manzano advised her via email "[y]es, we have your file on hand and are trying to send out payments for everything we have including this bill so we can close your file."

77. Caratini also contacted Serrano and Acosta regarding her unpaid claims. On June 17, 2020, Serrano responded via email, identifying herself as the CEO and Founder of "Beyond Staffing Solutions." Serrano apologized for the inconvenience and indicated she was in the process of "contacting ALL provider[s] to ensure . . . payment start going their ways."

78. As of the date of this Complaint approximately $30,000.00 of Caratini's medical bills remain unpaid. She has received numerous calls from collection agencies. Caratini is severely distressed as she is unable to pay her bills.

V. *Plaintiff Wolf's Experience*

79. Brooke Wolf enrolled in the Plan in May 2019. On April 24, 2019, she completed a "Health Care Member Benefits Enrollment Form."

80. Wolf's participation in the plan was also evidence by the monthly $667 premiums payment paid directly to MedAccess via debit/credit card.

81. Wolf's primary motivation for obtaining coverage was to secure health insurance for herself and her unborn child. According to documentation Wolf received, the Plan offered "Full access Wellness and Preventative Care," including "Maternity Pre/Post Natal." Wolf's baby was born in November 2019 and thereafter became a plan participant.

82. Wolf's providers have submitted claims from her labor and delivery to MedAccess for payment. Those claims have not been adjusted or paid.

83. Wolf has contacted MedAccess to demand payment of her unpaid claims. Via email, MedAccess representatives told her, falsely, that her claims would be paid. As of the date of this Complaint she has approximately $20,000 in unpaid medical bills.

84. In February of 2020 Wolf cancelled her participation in the Plan.

## CLASS ACTION ALLEGATIONS

85. Plaintiffs' experiences were substantially similar to that of all members of the Class, who were negatively impacted by MedAccess's mishandling of their claim for benefits.

86. Plaintiffs request the Court certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

87. Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of a nationwide Class under California law defined as follows: All current or former MedAccess Plan participants who were members of the Plan between January 2019 and the present. Excluded from the Class are: (i) Defendants and their officers and directors, agents, employees, affiliates, and subsidiaries; (ii) and the Judge presiding over this action.

88. Further, as discovery unfolds, additional classes or modified classes might be possible or necessary, perhaps delineated by State or by additional ERISA plans in which beneficiaries participated.

89. **Numerosity:** The MedAccess Plan was marketed and sold across the country, using fraudulent materials transmitted by wire and/or mail that falsely presented the Plan as legitimate. Hundreds of MedAccess customers experienced the issues described herein. The potential members of the class are so numerous that joinder of all the members of the Class is impracticable. This volume makes bringing the claims of each individual member of the class before this Court impracticable. Likewise, joining each individual member of the Class as a plaintiff in this action is impracticable.

90. **Commonality and Predominance:** There is a well-defined community of interest and common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which will generate common answers that are apt to drive the resolution of the litigation, do not vary among members of the Class. These common questions may be determined without reference to individual circumstances and will provide common answers. The following represent a non-exhaustive list of common questions:

    a. Whether the MedAccess Plan was systemically undercapitalized.

b. Whether MedAccess failed to establish a claims submission and review process as required by ERISA.

c. Whether MedAccess failed to designate a Plan Administer as required by ERISA.

d. Whether MedAccess collected premiums from Plan participants after the company was already defunct.

e. Whether Defendants concealed that MedAccess was part of a scheme to continue the sale of illegitimate health plans.

f. Whether any MedAccess Plan assets were embezzled.

g. Whether MedAccess fiduciaries breached their duties to the Plan.

h. Whether Defendants are liable for some or all of the foregoing breaches based on their role as MedAccess fiduciaries, alter egos and/or affiliates.

91. **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured by the same wrongful practices in which The Medical Access Network Enterprise and associated persons have engaged. Further, Plaintiffs and members of the Class seek relief based on the same legal theories. There may be differences in the amount of damages sustained by each member of the Class; however, Class-wide and individual damages can be determined readily. Individual damages issues will not bar Class certification.

92. **Adequacy of Representation:** The provisions governing ERISA allow beneficiaries the right to sue on behalf of the entire plan if a fiduciary breaches the plan's term. Moreover, Plaintiffs will fairly and adequately protect and pursue the interests of the Class. Plaintiffs understand the nature of the claims herein, their role in the proceedings, and will vigorously represent the Class. Furthermore, Plaintiffs have retained Class counsel who are experienced in and qualified in prosecuting complex litigation, including ERISA and RICO matters. Neither Plaintiffs nor their attorneys have interests that are contrary to or conflict with those of the Class.

93. **Superiority and Manageability:** A class action is superior to all other available methods of adjudication of this lawsuit. Because individual litigation of the claims of Class members is economically infeasible and judicially impracticable, the class action device is the only

1  way to facilitate adjudication of Plaintiffs' and the Class' claims. Individual damages incurred by
2  each member resulting from the MedAccess Network's wrongful conduct is not significant enough
3  for experienced counsel to handle on an individual basis. Further, even assuming individual Class
4  members could afford to pay counsel on an hourly basis, the damages sustained do not justify the
5  expenditure, making the likelihood of individual claims being pursued by the Class members
6  remote at best. Even then, the burden on the judicial system would be unjustifiable compared with
7  the benefits available under the class action device. Individual members of the Class do not have
8  significant interest in individually controlling the prosecution of separate actions, and
9  individualized litigation could result in varying, inconsistent, or contradictory judgments. Plaintiffs
10 know of no reason that this litigation should not proceed as a class action.

11    94.    The identities of class members will be determined from Defendants' records. The
12 nature of notice to the Class is contemplated to be by direct mail or, if such notice is not
13 practicable, by best notice possible under the circumstances.

### FIRST CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY UNDER ERISA

**(Brought against Serrano, Acosta, Manzano, MedAccess and RiseMed on behalf of the Class, or, Alternatively, the MedAccess Plan)**

18    95.    Plaintiffs reallege and incorporate all allegations by reference as if set forth fully herein.

20    96.    Pursuant to 29 U.S.C. § 1002, "a person is a fiduciary with respect to a plan to the extent [ ] he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."

24    97.    Serrano and Acosta are fiduciaries of the MedAccess Plan by virtue of, *inter alia*, their status as control persons of MedAccess and their discretionary authority over plan assets and payment of claims.

27    98.    Pursuant to 29 U.S.C. § 1004, ERISA fiduciaries have a duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in

a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Moreover, ERISA fiduciaries have a duty to discharge their duties with respect to a plan solely in the interest of participants and beneficiaries. *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

99. Pursuant to 29 U.S.C. § 1109 any fiduciary who breaches its obligation shall be liable to the plan and its participants for damages that arise out of these breaches.

100. Pursuant to 29 U.S.C. § 1105, co-fiduciaries are liable for the breaches of their co-fiduciaries if they knowingly participate in or conceal breaches of co-fiduciaries.

101. Although documents provided to Plaintiffs by MedAccess did not affirmatively identify a singular plan administrator, MedAccess, through its authorized representatives, at times held itself out as the MedAccess Plan administrator by, *inter alia*, disseminating plan documents and providing coverage information and billing updates to plan participants.

102. MedAccess, Serrano, and Acosta are fiduciaries of the Plan and have breached their duties to the Plan through their own individual acts or the acts of another co-fiduciary. Specifically, these Defendants failed to maintain any reasonable claims procedures, formally adjust claims, tender payment as required by Plan, disclose material facts affecting Plan participants, or even respond to inquiries from Plaintiffs and other Plan participants.

103. Upon information and belief, although Defendant Manzano may not be a Plan fiduciary, she was aware of the acts of these fiduciary Defendants and actively concealed these acts by reassuring participants their claims would be taken care of and suggesting that claim issues were due to third parties. Accordingly, her actions, in combination with ERISA fiduciaries, amounted to a conspiracy to facilitate violations of ERISA.

104. Upon information and belief, RiseMed Health is a disguised continuation of Medical Access Network, allowing MedAcess fiduciaries to avoid their responsibilities to participants under the Plan. RiseMed Health is an alter ego of Medical Access Network.

105. Collectively, the failures of the MedAccess Plan's fiduciaries, its co-conspirators and its alter ego resulted in several ERISA violations—including 29 U.S.C. § 1135, 29 C.F.R. § 2560.503-1(h), for failing to process claims in a good faith, fair and diligent manner; and 29 U.S.C.

§ 1132, for failing to provide beneficiaries adequate plan documentation. Moreover, these failures demonstrate that these fiduciary Defendants failed to discharge their duties in the interest of Plaintiffs, Plan participants and beneficiaries.

106. Plaintiffs and the Plan participants are entitled to relief under 29 U.S.C. § 502(a)(3) to redress damages incurred as a result of Defendants' ERISA violations, including unpaid benefits due and owing under the Plan, restitution of premiums, and other damages sustained as a result of Defendants' fiduciary breaches. Plaintiffs also seek an injunction ordering the Plan administrators to review their claims.

107. Pursuant to 29 U.S.C. § 1132, Defendants are liable under ERISA Section 502(a)(2) for damages their fiduciary breaches caused to the Plan, including restoration of all plan assets and the fees and costs associated with these proceedings.

## SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 1961

### Racketeer Influence and Corrupt Organizations Act ("RICO")

### (Brought Against All Defendants on behalf of the Class)

108. Plaintiffs reallege and incorporate all allegations by reference as if set forth fully herein.

109. MedAccess is part of an illegitimate network of affiliates under common control that use mail and wire to sell and maintain undercapitalized health insurance premiums—the health insurance analog to a Ponzi scheme.

110. In addition to violating their fiduciary duties under the statutes governing ERISA, Defendants engaged in conduct that amounted to a pattern of racketeering activity in violation of the federal Racketeer Influence and Corrupt Organizations statue (RICO).

111. At all relevant times there has been and continues to be an association-in-fact, joined at relevant times by the Medical Access Network, LLC and other similar legal entities, including Inzuria Health and RiseMed Health, and the benefits plans administered under each of these entities. All these entities were entitled to use the service mark "Med Access Network." The associations-in-fact of these entities, their affiliates and the plans administered under each of them

1 are "enterprises" within the meaning of 18 U.S.C. § 1961(4).  All Defendants named in this
2 Complaint are alleged to be participants in the Enterprise, either as affiliate entities carrying out the
3 scheme or as control persons of those entities.

4       112.   A purpose of the Med Access Network Enterprise has been and continues to be to induce unwitting customers, particularly expectant mothers, to pay premiums into an undercapitalized medical benefits plan. The Medical Access Network associates that participate in the Enterprise aid and assist each other, sometimes acting as the control plan in administering a medical benefit plans and sometimes acting as a participating plan.

9       113.   By operating under the various entities, the Med Access Network enterprise participants knowingly avoided their fiduciary obligations to plan participants. To date Plaintiffs and other Plan participants are unable to contact Inzuria Health or MedAccess, leaving participants without any way to get their claims paid.  Moreover, Plan participants were not made aware that MedAccess is now continuing as RiseMed.

14       114.   To propel this scheme the members of the Enterprise committed various acts of wire and mail fraud, each of which were designed to knowingly convince prospective participants of the legitimacy of the plans. By continuously rebranding their materials they also willfully concealed the previously unsuccessful and defunct nature of prior plans offered by the Med Access Network. For example, material mailed to Sheri Latronico in March of 2019 materially misrepresented the legitimacy of the Plan and incorrectly indicated that it was governed by ERISA in an attempt to secure payment of monthly premiums, even though members of the Enterprise were aware that as a participant she would have no meaningful access to ERISA claims procedures. Moreover, the Medical Access Plan repeatedly represented to Plan participants via mail and wire that their claims would be paid, even after they shut down their corporate office and began operating at RiseMed—all in an effort to ensure that participants would continue paying premiums into the illicit scheme.

25       115.   As plans were offered by mail and wire "in all 50 states," this scheme impacted interstate commerce.

116. A continuing threat that the racketeering conduct will continue exists as Defendants are actively soliciting new plan participants out of 530 E. Herndon Ave, Ste 105, Fresno, CA 93720 (operating as RiseMed).

117. All Defendants participated in the operation and management of the Enterprise itself and are therefore liable to Plaintiffs for damages under RICO.

118. As a result of this scheme, MedAccess Plan participants who justifiably believed in the legitimacy of the plan, including Plaintiffs, paid for health insurance they did not actually receive. These Plan participants lost dutifully paid premiums and are now facing large unpaid medical bills that should have been paid, in whole or in part, by the MedAccess Plan and which are causing significant damages to Plaintiffs' credit, finances, and well-being. In some instances, Plaintiffs also suffered financial losses when they paid medical bills that should have been covered under the MedAccess Plan.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the other members of the Class respectfully request that the Court enter a Judgment against Defendants as follows:

A. Certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B. Awarding Plaintiffs and the other members of the Class damages and all other relief available under the claims alleged, including treble damages and punitive damages where appropriate;

C. Awarding Plaintiffs and other members of the Class pre-judgment and post judgment interest as a result of the wrongs complained of herein;

D. Requiring Defendants to disgorge the revenue earned through the Medical Access Network scheme as described herein;

E. Awarding Plaintiffs and other members of the Class restitution;

F. Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and other costs of litigation; and

G. Awarding such other relief as the Court deems just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 18, 2020                Respectfully submitted,

*[signature: Adam Wolf]*

ADAM B. WOLF (Cal. Bar No. 215914)
TRACEY B. COWAN (Cal. Bar No. 250053)
PEIFFER WOLF CARR KANE & CONWAY,
A PROFESSIONAL LAW CORPORATION
5042 Wilshire Blvd., No. 304
Los Angeles, CA 90036
Telephone: (415) 766-3545
Facsimile: (415) 402-0058
awolf@peifferwolf.com
tcowan@peifferwolf.com

DANIEL CENTNER*
KORBY KAZYAK*
PEIFFER WOLF CARR KANE & CONWAY,
A PROFESSIONAL LAW CORPORATION
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: (504) 523-2434
Facsimile: (504)-608-1465
dcentner@peifferwolf.com
kkazyak@peifferwolf.com

*Attorneys for Plaintiffs and the Proposed Class*

*Will seek admission *pro hac vice*